**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | Case No. 13-15575-MSH |
| PIHL, INC. | ) | |
| | ) | |
| Debtor | ) | |
| | ) | |
| | ) | |
| KATHLEEN P. DWYER, CHAPTER 7 | ) | |
| TRUSTEE OF THE ESTATE OF PIHL, | ) | |
| INC. | ) | Adversary Proceeding |
| | ) | No. 13-1384 |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE INSURANCE COMPANY OF THE | ) | |
| STATE OF PENNSYLVANIA, | ) | |
| AMERICAN INTERNATIONAL | ) | |
| COMPANIES AND MIDDLESEX | ) | |
| SAVINGS BANK | ) | |
| | ) | |
| Defendants | ) | |

## MEMORANDUM OF DECISION

Kathleen P. Dwyer, the chapter 7 trustee of the estate of Pihl, Inc., the debtor in the main

case, initiated this adversary proceeding by filing a six-count complaint against the Insurance

Company of the State of Pennsylvania ("ICSP") and American International Companies ("AIC,"

and collectively with ICSP, the "Sureties") seeking to set aside and recover certain alleged

preferential transfers (counts II-V) and for a turnover order and injunctive relief (counts I and

1

IV) with respect to certain funds held by the third defendant, Middlesex Savings Bank

("Middlesex").[1]

A bench trial in this adversary proceeding took place over two days. Based on the

evidence introduced, arguments most ably delivered by counsel and matters of which I may take

judicial notice, I present this memorandum of decision which includes my findings of fact and

conclusions of law in accordance with Fed. R. Bankr. P. 7052.

## Jurisdiction

This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334

and § 157. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (E), (F) and (O)

which I may determine by final order. Venue is appropriate pursuant to 28 U.S.C. § 1409.

## The Court's Prior Ruling

Judge William C. Hillman of this Court had occasion to discuss many of the factual and

legal issues in this adversary proceeding in a memorandum of decision denying the parties'

cross-motions for summary judgment. *Dwyer v. The Insurance Company of the State of*

*Pennsylvania (In re Pihl, Inc.)*, 529 B.R. 414 (Bankr. D. Mass. 2015) [hereinafter *Pihl I*]. While

Judge Hillman's interlocutory findings and rulings in *Pihl I* are not preclusive with respect to my

rulings here, they are, characteristically thoughtful and well-reasoned, and have informed many

of my conclusions.[2]

---

[1]  Immediately following the filing of the complaint, some of the money held by Middlesex was
delivered to Ms. Dwyer without prejudice to the claims and defenses asserted in this adversary
proceeding. Therefore, the complaint is deemed amended to include a claim that the funds Ms.
Dwyer holds are also subject to the relief she requests. Fed. R. Bankr. P. 7015(b)(2).

[2]  "A denial of a motion for summary judgment is interlocutory in character and is normally not
appealable as a final decision." *Emery v. Holmes*, 824 F.2d 143, 145 (1st Cir. 1987) (citing
*Agromayor v. Colberg,* 738 F.2d 55, 57 (1st Cir. 1984). "[I]nterlocutory orders . . . do not

Findings of Fact

The debtor, Pihl, Inc., was the American subsidiary of E. Pihl & Son A.S, a Danish

company. Pihl provided general contracting services on large public works projects, including

several highway and bridge construction projects.[3] The defendant, ICSP, a member of American

International Group ("AIG"),[4] issued performance and payment contract surety bonds for certain

of Pihl's projects.[5] The defendant, AIC, is also a member of AIG. Pihl as principal entered into

an Agreement of Indemnity dated January 12, 2006 (the "Indemnity Agreement"), with AIC

pursuant to which Pihl agreed to indemnify the Sureties for any losses or expenses they incurred

in connection with any surety bonds issued on behalf of Pihl.[6] To secure its obligations under the

Indemnity Agreement, Pihl as Principal assigned to the Sureties rights in various assets

including:

> (a) All the rights of the Principals in, and growing in any manner out of, all contracts
> referred to in the Bonds, or in, or growing in any manner out of the Bonds; . . . (e)
> Any and all percentages retained and any and all sums that may be due or hereafter

---

constitute the law of the case." *Perez-Ruiz v. Crespo-Guillen*, 25 F.3d 40, 42 (1st Cir. 1994)
(citing *Union Mut. Life Ins. Co. v. Chrysler Corp.*, 793 F.2d 1, 15 (1st Cir. 1986)). *See also
Negron-Almeda v. Santiago*, 579 F.3d 45, 51 (1st Cir. 2009) (noting that an order that did not
"dispose of the rights and liabilities of all the parties" did not constitute a final judgment).

[3] Stipulation Regarding Admitted Facts and Exhibits for Trial at ¶ 3, *Pihl I*, 529 B.R. 414
[hereinafter "Stipulation"]. E. Pihl & Son filed bankruptcy proceedings in Denmark on or about
August 26, 2013. Stipulation at ¶ 10.

[4] Trial ex. 1.

[5] Stipulation at ¶ 5; trial ex. 5-8.

[6] Trial ex. 1.

become due on account of any and all contracts referred to in the Bonds and all other contracts whether bonded or not in which the Principal has an interest.[7]

By contract dated April 27, 2010 (the "Nahant Contract"), Pihl undertook to perform the Nahant Beach Reservation Reconstruction in Nahant, Massachusetts (the "Nahant Project") for the awarding authority, the Massachusetts Department of Conservation and Recreation (the "DCR").[8] By contract dated April 13, 2011 (the "Willimansett Contract"), Pihl undertook to perform the Willimansett Bridge Deck and Replacement in Chicopee and Holyoke, Massachusetts (the "Willimansett Project," and collectively with the Nahant Project, the "Bonded Projects") for the Massachusetts Department of Transportation (the "DOT," and collectively with the DCR, the "Project Owners").[9] ICSP issued payment and performance bonds for the Nahant and Willimansett Projects on April 29, 2010, and April 26, 2011, respectively.[10]

Each contract permitted the respective Project Owner to terminate the contract for cause. The Nahant Contract states in relevant part:

> The DCR may without prejudice to any other right or remedy deem this Contract terminated for cause if any of the following *defaults* shall occur and not be cured within five (5) days after the giving of notice thereof by the DCR to the Contractor and any surety that has given bonds in connection with this Contract.[11]

---

[7] Trial ex. 1 at ¶ Third (e).

[8] Stipulation at ¶ 8a.

[9] Stipulation at ¶ 8b.

[10] Trial ex. 3-6. A contract between Pihl and the DOT for the rehabilitation of the General Edwards Drawbridge is referenced by the parties. Although ICSP subsequently took over this project, there are no funds at issue with respect to this project in this adversary proceeding.

[11] Trial ex. 25 at Part III, Article XVII ¶ 1 (emphasis added).

The Willimansett Contract incorporates the Standard Specifications for Highways and Bridges.[12]

The Standard Specifications contains a section titled "Default Termination" that states in relevant part:

> If the Contractor shall be adjudged a bankrupt, or if he shall make a general assignment for the benefit of his creditors, or if a receiver of his property shall be appointed, or if the work done under the Contract shall be abandoned, . . . the Party of the First Part may notify the Contractor to discontinue all work, or any part thereof. Such notice shall be given to the Contractor in writing and thereupon the Contractor shall discontinue such work or part thereof . . . .[13]

On September 12, 2013, Pihl informed ICSP that Pihl was letting all of its employees go on that day and would not continue to work on the Bonded Projects.[14]  On September 13, 2013, Pihl ceased work on the Bonded Projects.[15]  On September 13, 2013, Douglas Fine, on behalf of ICSP, sent letters to the DOT and the DCR demanding that "no further funds be released under the [Bonded Projects] without the written consent and direction of ICSP."[16]  On September 13, 2013, Mr. Fine sent a letter bearing the reference line "Projects: Improvement to the Third Avenue Bridge," by express and certified mail, to Pihl.[17]  The body of the letter referenced by bond number the bonds for the Bonded Projects, among others, and noted that Pihl had terminated all of its employees and was unable to complete all of the projects bonded by ISCP.

---

[12] Trial ex. 26 and 27.

[13] Trial ex. 27 at Section 8.12.

[14] Testimony of Douglas Fine at 22, *Pihl I*, 529 B.R. 414 [hereinafter "Fine Testimony"] ; Stipulation at ¶ 12.

[15] Stipulation at ¶ 12.

[16] Stipulation at ¶ 13; trial ex. 11 and 12.

[17] Trial ex. 10.

The letter pointed out that litigation had been commenced by All-Set Corp. against Pihl and

ICSP pursuant to certain bonds, including the Willimansett Project bond, and stated that ICSP

"has been and continues to be exposed to substantial losses under its bonds."[18] The letter was

delivered to Pihl on or about September 14th. Pihl never responded, prompting Mr. Fine to send

another letter on September 17, 2013, demanding that Pihl provide collateral security of at least

$1,072,804.00 by September 19, 2013.[19] Again there was no response. On September 16, 2013,

AIC filed a UCC-1 financing statement describing a security interest in the property identified in

the assignment provision of the Indemnity Agreement.[20]

On September 18, 2013, ICSP commenced an action against Pihl in the United States

District Court for the District of Massachusetts seeking damages pursuant to the Indemnity

Agreement and an attachment of Pihl's bank accounts at Middlesex. On September 19th, the

District Court approved the attachment of "all bank accounts, funds, monies, or other things" of

Pihl up to $1,072,804.[21] On the morning of September 20, 2013, ICSP served Middlesex with a

writ of attachment. That afternoon Pihl filed its voluntary chapter 7 petition commencing the

main case.[22]

On September 18, 2013, the DOT sent a notice to Pihl stating, among other things, that

Pihl was in default of the Willimansett Contract, that work had apparently stopped as of

---

[18] *Id.*

[19] Trial ex. 14.

[20] Stipulation at ¶ 14; trial ex. 9.

[21] Stipulation at ¶ 17.

[22] Stipulation at ¶ 20.

September 13, 2013, and that under section 8.12 of the Contract, titled "Default Termination," Pihl had "five (5) days to re-start work at the site in accordance with the requirements of the contract."[23] Pihl never restarted work on the Williamsett Project. On October 24, 2013, the DOT followed up its September 18th letter to Pihl with a notice to Pihl and ICSP that Pihl "is in default" of the Williamsett Contract.[24] On May 12, 2014, ICSP entered into a written tender agreement with the DOT pursuant to which ICSP paid the DOT $6,360,307.67 to fund completion of the Williamsett Project.[25] In total, ICSP paid $8,326,662.60 under or related to the payment and performance bonds for the Williamsett Project.[26]

The DCR did not send similar notices with respect to the Nahant Project but on November 6, 2013, ICSP entered into a written takeover agreement with the DCR to complete the Nahant Project.[27] ICSP advanced $4,989,357.08 to complete the Nahant Project. It recovered $3,883,947.13 in payments from the DCR resulting in a net loss of $1,105,947.13.[28]

By order dated October 23, 2013, this Court approved a stipulation pursuant to which the Bonded Contracts were deemed rejected as of October 22, 2013.

From time to time the Sureties received notices of various claims by third parties (mostly subcontractors) against Pihl on one or more of its bonded projects, including the Bonded

---

[23] Stipulation at ¶ 18.

[24] Stipulation at ¶ 19.

[25] Stipulation at ¶ 29.

[26] Stipulation at ¶ 32.

[27] Stipulation at ¶ 27.

[28] Stipulation at ¶ 33.

Projects. No evidence introduced at trial established that these claims resulted in the Sureties' exercising their rights under the Indemnity Agreement or the Project Owners' calling defaults under the Project Contracts.

Prior to Mr. Fine's September 13, 2013 letter, the Sureties neither exercised their rights under the Indemnity Agreement[29] nor declared Pihl in default under any of the relevant agreements by virtue of claims asserted by the Project Owners or third parties because, as Mr. Fine testified at the trial, the Sureties did not customarily declare a principal in default or even use the word "default" in its correspondence notifying a principal of a claim. He testified that "we notif[y] the principal of the existence of these claims and gets them copies and even in [the] letters . . . always say . . . that we will look to you, our principal and our indemnitors, to hold us harmless in this matter (sic)."[30]

The funds at issue in this adversary proceeding resulted from three payments made in September and October 2013. On September 4, 2013, the Commonwealth of Massachusetts made a payment of $250,654.14 by deposit into Pihl's Middlesex account for work performed by Pihl on the Willimansett Project prior to September 4, 2013 (the "First Payment").[31] On September 17, 2013, the Commonwealth deposited $391,428.74 into Pihl's Middlesex account for work performed by Pihl on the Nahant Project prior to September 12, 2013 (the "Second Payment").[32] On October 3, 2013, the Commonwealth deposited $207,088.66 into Pihl's

---

[29] Fine Testimony, at 35-36.

[30] Fine Testimony at 31-32. I take Mr. Fine's use of the word "we" to include ICSP and AIC.

[31] Stipulation at ¶ 11.

[32] Stipulation at ¶ 15.

Middlesex account for additional work performed by Pihl on the Nahant Project prior to September 12, 2013 (the "Third Payment").[33] Middlesex continues to hold the First and Second Payments while Ms. Dwyer is holding the Third Payment pending the outcome of this proceeding. The parties have agreed that an additional $38,732.03, which Middlesex is holding, may be paid to Ms. Dwyer free of any claims of the Sureties.[34]

## Parties' Positions

Boiled down to its essence, this is a battle over who has superior rights to the First, Second and Third Payments. Ms. Dwyer in her complaint seeks to avoid the Sureties' UCC-1 filing and the attachment of Pihl's Middlesex bank accounts as preferences by which the Sureties attempted to turn their multi-million dollar unsecured claims against Pihl into secured claims. She also seeks an order requiring Middlesex to turn over to her all funds it is holding and granting injunctive relief essentially to prevent any interference with her unfettered use of those funds or the funds she obtained from Middlesex subsequent to filing the complaint.

The Sureties strenuously disagree with Ms. Dwyer's premise that they are and have always been mere general unsecured creditors of Pihl. The Sureties assert equitable and contractual rights in the funds representing the three payments, the former under the doctrine of equitable subrogation and the latter by virtue of the assignment provision of the Indemnity Agreement.[35] As subrogees and assignees, the Sureties claim that the funds never became

---

[33] Stipulation at ¶ 23.

[34] Stipulation at ¶ 31. The parties agree that Pihl maintained several accounts at Middlesex Saving Bank into which the Parent and project owners for whom Pihl was providing construction services deposited funds, generally by wire transfer. Stipulation at ¶ 4.

[35] A third argument, that Middlesex held the funds in a constructive trust for the benefit of the Sureties was rejected by Judge Hillman in *Pihl I*, and the Sureties did not present evidence on or

property of Pihl's bankruptcy estate, or in the alternative, by virtue of an equitable lien, that they

have an interest in the funds superior to that of the trustee.[36] With respect to the First Payment

already received by Pihl prior to September 13th, the Sureties' maintain that their subrogation

and assignment rights had retroactive effect to capture that payment since the funds had not been

spent.

Conclusions of Law

Equitable Subrogation

Whether the doctrine of equitable subrogation under state law is available in bankruptcy

cases in light of the Bankruptcy Code's broad definition of property of the estate and its own

detailed subrogation provisions under § 509 is a matter of disagreement among the courts. As I

recently noted in an unrelated case:

---

press this argument at trial.

[36] Under the Bankruptcy Act of 1898, funds subject to equitable subrogation were excluded from
property of the bankruptcy estate. *Pearlman v. Reliance Ins. Co.,* 371 U.S. 132 (1962).
Following the 1978 enactment of the Bankruptcy Code, with its expansive definition of property
of the estate in § 541, reported decisions have applied the doctrine of equitable subrogation
alternatively as preventing property from ever becoming part of a bankruptcy estate or as giving
rise to an equitable lien superior to the rights of a bankruptcy trustee or other secured creditors,
depending on the specific facts of the case. These cases are collected and discussed in
*Mendelsohn v. The Dormitory Auth. of the State of New York (In re QC Piping Installations,
Inc.)*, 225 B.R. 553 (Bankr. E.D.N.Y. 1998). Although concluding that the contract retainage was
not property of the bankruptcy estate, the *QC Piping* court noted that even if the retainage had
been part of the estate, the bankruptcy estate would have taken its interest subject to the surety's
equitable rights to the funds. *Id.* at 571. In a very recent bankruptcy court decision, *In re
Glenbrook Group, Inc.*, 552 B.R. 735 (Bankr. N.D. Ill. 2016), the court determined that such
funds are property of the bankruptcy estate. Yet as the *Glenbrook* court noted, merely
determining that funds are property of the estate does not answer the ultimate question of who is
entitled to such funds. *Id.* at 740 (requiring the trustee to hold funds pending a determination of
whether equitable lien arose under state law). Thus, whether the funds at issue here never entered
the bankruptcy estate or became property of the estate encumbered by ICSP's lien has no
practical impact on the outcome of this adversary proceeding.

> There is disagreement among the courts over the interrelationship between equitable
> subrogation under state law and subrogation under Bankruptcy Code § 509, specifically
> "as to whether § 509 preempts any other form of subrogation theory, or whether equitable
> subrogation criteria are the test under § 509, or whether equitable subrogation is an
> alternative method to § 509." *In re Celotex Corp.*, 289 B.R. 460, 469 (Bankr. M.D. Fla.
> 2003) (citations omitted).

*In re Morrison*, No. 15-14094, 2016 WL 4512164, at *2 (Bankr. D. Mass. Aug. 2, 2016).[37] A

decisive majority of courts hold and the parties in this proceeding agree, that equitable

---

[37] *See also In re Fiesole Trading Corp.,* 315 B.R. 198, 203-04 (Bankr. D. Mass. 2004) ("Courts
are not generally in agreement as to whether or to what extent the requirements of equitable
subrogation under state law inform the interpretation and application of requirements for
subrogation under § 509 of the Bankruptcy Code.") (citing *In re Photo Mech. Servs.,* 179 B.R.
604, 618-19 (providing extensive citations and a clear description of courts' varied treatment of
subrogation in bankruptcy)). Some courts have either explicitly or implicitly held that the
requirements of equitable subrogation must be met before subrogation may be available in
bankruptcy cases, even where a party seeks subrogation pursuant to § 509. *See, e.g., Buckeye
Union Ins. Co. v. Four Star Const. Co. (In re Four Star Constr. Co.),* 151 B.R. 817, 820-21
(Bankr. N.D. Ohio 1993); *In re FJS Tool & Mfg. Co., Inc.,* 88 B.R. 866, 870 (Bankr. N.D. Ill.
1988); *Bank of Am. v. Kaiser Steel Corp. (In re Kaiser Steel Corp.),* 89 B.R. 150, 152 (Bankr. D.
Colo. 1988); *Baxter v. Flick (In re Flick),* 75 B.R. 204, 206 (Bankr. S.D. Cal. 1987); *Towers v.
Moore (In re DiSanto & Moore Assocs., Inc.),* 41 B.R. 935, 938 (N.D. Cal. 1984). Many courts
have noted that the requirements of § 509 are distinguishable from those of equitable
subrogation, but have held or implied that either theory may provide a basis for subrogation in a
bankruptcy case. *See, e.g., Wilson v. Brooks Supermarket, Inc. (In re Missionary Baptist Found.
of Am.),* 667 F.2d 1244, 1246 (5th Cir. 1982); *Wetzler v. Cantor,* 202 B.R. 573, 577 (D.
Md.1996); *Cuda v. Nigro (In re Northview Motors, Inc.),* 202 B.R. 389, 401 (Bankr. W.D. Pa.
1996); *In re Spirtos,* 103 B.R. 240, 243-45 (Bankr. C.D. Cal.1989). Other courts have held that
the remedies of equitable subrogation and subrogation under § 509 are separate and distinct, but
do not decide whether state law theories of equitable subrogation are available in a bankruptcy
case. *See, e.g., Cornmesser v. Swope (In re Cornmesser's, Inc.),* 264 B.R. 159, 162-63 (Bankr.
W.D. Pa. 2001); *In re Photo Mech. Servs.,* 179 B.R. at 618-19. Finally, a small number of courts
have found that equitable subrogation principles do not apply in bankruptcy cases on account of
the codification of subrogation rights under § 509. *See, e.g., Creditor's Comm. v. Mass. Dep't of
Revenue,* 105 B.R. 145, 148 (D. Mass. 1989); *Cooper v. Cooper (In re Cooper),* 83 B.R. 544,
546 (Bankr. C.D. Ill. 1988)."). *See also In re Glenbrook Group, Inc.*, 552 B.R. at 740 ("[T]he
very things that the Court states are not property of the estate in *Pearlman* [*v. Reliance Ins.
Corp.*, 371 U.S. 132 (1962)], property subject to equitable interests, mortgages, liens, etc., are
now included as property of the estate under § 541(d), albeit subject to any equitable interest.")

subrogation principles remain applicable in bankruptcy.[38] I am persuaded by the majority view.

"Equitable subrogation occurs where one party, by virtue of its payment of another's obligation, steps into the shoes of the party who was owed the obligation for purposes of getting recompense for its payment." *In re N. Am. Rubber Thread Co.,* 333 B.R. 164, 168 (Bankr. D. Mass. 2005). "When the surety then finances the contract to completion, it is subrogated to the contractor's property rights in the contract balance." *Balboa Ins. Co. v. United States*, 775 F.2d 1158, 1161 (Fed. Cir. 1985). The doctrine can be invoked in the absence of an express subrogation agreement. *N. Am. Rubber Thread Co.,* 333 B.R. at 168. It does not require that a financing statement be filed. *Nat'l Shawmut Bank v. New Amsterdam Cas. Co.*, 411 F.2d 843 (1st Cir. 1969); *Canter v. Schlager,* 358 Mass. 789, 791 (1971).

A surety "may stand in the shoes of either (1) the contractor whose obligations are discharged, (2) the owners to whom it was bound, or (3) the subcontractors whom it paid." *Canter,* 358 Mass. at 794 (citing *Pearlman,* 371 U.S. at 141).

Under Massachusetts law courts look to the following factors to determine whether equitable subrogation applies:

> (1) the subrogee made the payment to protect his or her own interest, (2) the subrogee did not act as a volunteer, (3) the subrogee was not primarily liable for the debt paid, (4) the subrogee paid off the entire encumbrance, and (5) subrogation would not work any injustice to the rights of the junior lienholder.

---

[38] *See generally*, Walker and Calabrese, 1994 Ann. Surv. of Bankr. Law 17 ("While § 509 permits codebtor subrogation, several bankruptcy Courts considering the question have determined that § 509 is not the exclusive source of subrogation rights. Many bankruptcy cases discuss the elements necessary to maintain a claim for equitable subrogation under state law without even mentioning § 509.") (footnotes omitted). Judge Hillman in *Pihl I* assumed the applicability of Massachusetts equitable subrogation principles in this adversary proceeding.

*East Boston Sav. Bank v. Ogan,* 428 Mass. 327, 330 (1998). Not all factors need be present for equitable subrogation to apply. *Id.*

There is disagreement about when subrogation rights arise. Some courts require a surety to begin making payments before its subrogation rights are triggered; others recognize subrogation rights as soon as a surety incurs a legal obligation to pay. *See Pihl I* at 426. I agree with Judge Hillman in *Pihl I* that that latter approach is the correct one. Thus, as soon as the Sureties incurred a legal obligation to the Project Owners, they were entitled to contract retainages and progress payments that were earned by but not yet paid to Pihl. *Pihl I* at 425. Upon receipt of notice of the Sureties' rights to funds from the Bonded Projects, the Project Owners held those funds for the Sureties' benefit." *Id.* at 425-26.

In arguing that equitable subrogation principles do not apply to any of the three payments at issue here, Ms. Dwyer focuses on the default and termination provisions of the Project Contracts. She claims default was the exclusive triggering event for termination of the Project Contracts and that the Sureties' subrogation rights would not have arisen until default and subsequent termination.[39] She claims that the Willimansett Contract was terminated no earlier than September 18, 2013, when the DOT sent Pihl a letter declaring Pihl in default. As for the Nahant Contract, because the DCR never declared Pihl in default, Ms. Dwyer argues that the Nahant Contract was never terminated. The upshot is, according to Ms. Dwyer, that the Sureties'

---

[39]To the extent that the trustee also argued that cases dealing with equitable subrogation under the Miller Act are inapplicable to disputes outside of federal contracts, that argument was rejected by the First Circuit in *Framingham Trust Co. v. Gould-Nat'l Batteries, Inc.*, 427 F.2d 856, 858 (1st Cir. 1970) ("[W]e do not understand the propositions enunciated in *National Shawmut Bank*, 411 F.2d 843] to be confined to cases arising under the Miller Act, where the United States is the owner.").

subrogation rights in the Willimansett Contract arose no earlier than September 18, 2013, and so

do not attach to the First Payment received on September 4th, and never arose at all with respect

to the Nahant Contract, so the Second and Third Payments are also not subject to the Sureties'

subrogation rights.

  Ms. Dwyer's position that the Sureties have no subrogation rights in the three payments

because of the timing of the declarations of default, conflates the rights of the DOT and DCR to

terminate the Project Contracts with Pihl's obligations to perform under those Contracts and the

Sureties' guaranteeing such performance to the DOT and DCR. The Project Owners' decision to

terminate the Contracts has nothing to do with triggering the Sureties' obligations under the

payment and performance bonds. It is the failure of Pihl to perform that was the triggering event.

There is nothing in the payment or performance bonds for either the Willimansett or Nahant

Projects that requires a declaration of default to issue as a precondition to ICSP's obligations to

perform or its right to recoup its losses. *Compare Fidelity & Deposit Co. of Maryland v. Casey

Indust., Inc.*, 8:12CV70, 2014 WL 1096355 (D. Neb. March 19, 2014) (rejecting need for formal

declaration of default despite similar language in bonds because bonded contract did not so

require) *with Elm Haven Constr. Ltd. v. Neri Const. LLC*, 376 F.3d 96, 98 (2d Cir. 2004)

(surety's obligation not triggered under performance bond expressly providing that "whenever

Principal [contractor] shall be, and be declared by the Obligee [project owner] to be in default"

when no default declared); *Liberty Mut. Ins. Co. v. Constr. Mgmt. Servs., Inc.,* No. 99C6906,

2004 WL 2271811, at *3 (N.D. Ill. Oct. 6, 2004) (same). Indeed Ms. Dwyer had to look to the

Project Contracts even to find the word "default."

  I conclude that the Sureties' subrogation rights arose no later than September 13, 2013,

14

when Pihl ceased performing work on the Bonded Projects. Thus the Second and Third

Payments are subject to the Sureties' subrogation rights. Whether those funds never entered the

bankruptcy estate or came into the estate encumbered by the Sureties equitable lien is a

distinction with no impact on the question of who is entitled to those payments. The Sureties'

rights in the Second and Third Payments are superior to Ms. Dwyer's.

As for the First Payment which was made prior to the inception of the Sureties'

subrogation rights, the Sureties argue that once triggered, their subrogation rights relate back to

capture funds previously received by Pihl under the Project Contracts and not yet spent. This

argument misconstrues the concept of relation back. "[T]he surety's right is only a potential one

which does not become an actuality until the surety satisfies a debt [or at least becomes liable for

it] of its principal." *Home Indem. Co. v. United States*, 376 F.2d 890, 893 (Ct. Cl. 1967); *In re

Bay State York Co., Inc*., 162 B.R. 922, 934 (Bankr. D. Mass. 1993) ("[T]he relation back

principle employed by the Court in *Canter* relates to the legal effect of the surety's actions rather

than the actions themselves."). *Canter* explained that a bankruptcy trustee's rights as a judgment

lien creditor did nothing to enhance his claim to the funds at issue because the surety's rights

related back to the date of the bond. *Id*. at 795.[40] Equitable subrogation gives the surety the right

to funds earned *but unpaid* when the right ripens from a potential right to an actuality. *Pearlman,

National Shawmut* and *Cantor* on which the Sureties rely accord them no support. All dealt with

a surety's right to collect payments earned but unpaid until after default. Consequently, the

---

[40] *Canter* was decided under the Bankruptcy Act and thus the broad reach of Bankruptcy Code
§ 541 was not an issue. But *Canter's* acknowledgement that the trustee's rights as a lien creditor
arose too late to defeat the surety's rights arising as of the date of the bonds (*because of the
doctrine of relation back*) apply with equal force to cases under the Bankruptcy Code.

15

Sureties cannot establish any rights to the funds representing the First Payment under principles of equitable subrogation.

The Indemnity Agreement Assignment

"The theory of equitable subrogation is based on the view that the triggering of a surety's bond obligation gives rise to an implied assignment of rights by operation of law whereby the surety is subrogated to the [principal contractor's] property rights in the contract balance," *Colonial Sur. Co. v. United States*, 108 Fed. Cl. 622, 633 (2013). In addition to their rights as subrogees, the Sureties assert rights in the three payments by virtue of the assignment provision in the Indemnity Agreement. They rely on language in the assignment provision making the assignment "effective as of the date of the bond covering such contract," to assert rights as assignees in the First Payment even though the First Payment predated any of the six triggering events set forth in the assignment provision.

Ms. Dwyer disagrees with the Sureties' relation-back argument and then doubles down by throwing an even more challenging obstacle in the Sureties' path.   She maintains that the assignment provision of the Indemnity Agreement is a grant of a security interest subject to the perfection requirements of the Uniform Commercial Code ("UCC"). The Sureties did not perfect their security interest until AIC filed a financing statement with the Massachusetts Secretary of State on September 16, 2013. That date being within 90 days of Pihl's bankruptcy filing, Ms. Dwyer asserts AIC's perfection is void as a preference under Bankruptcy Code § 547 and the Sureties are merely general unsecured creditors in the bankruptcy case.

Whether the Indemnity Agreement granted an assignment or a security interest in the project payments is a question of contract interpretation under New York law, the controlling

16

law selected by the parties to the Indemnity Agreement. In *Pihl I* Judge Hillman presented a

thorough analysis of New York law regarding assignments for security concluding that "the

language of the assignment provision in the Indemnity Agreement at issue here is within the

parameters of what New York courts have held is an effective assignment." *Pihl I*, at 428. I

concur with Judge Hillman and find that the assignment provision of the Indemnity Agreement

granted an assignment for security not dependent upon filing under the UCC for its validity.[41]  As

such, perfection by filing a financing statement was unnecessary.

But the question remains, was the assignment provision of the Indemnity Agreement

effective to confer upon the Sureties rights as assignees retroactive to the inception of the

payment and performance bonds? The answer is that the Sureties will be no more successful with

respect to their contract rights than they were in asserting retroactive application of their

equitable subrogation rights. This is because the Indemnity Agreement does not do for the

---

[41]  An "assignment as security" does not disqualify the assignment from being effective as such
under New York law.

> The fact that an assignment by a creditor or obligee is given by him "as security" for the
> performance of some obligation or as "indemnity" against some possible future loss or
> injury does not in itself make that assignment a "partial assignment".... It is true that, in
> case of such a total assignment "as security," the grantor or assignor still has an "interest"
> to be protected; but analysis shows that it is secondary and inferior to that of the assignee.
> It no longer includes any presently enforceable right to the performance promised by the
> obligor. It is the assignee alone who has that enforceable right; and it is now the assignee
> to whom the obligor is legally bound to pay every dollar included in the assignment. . . . .

4 Corbin, *Contracts* § 891, at 268–69 (Supp.1992). *See also Maloney v. John Hancock Mut. Life
Ins. Co.*, 271 F.2d 609, 614 (2d Cir. 1959) ("[N]umerous decisions of this circuit recognize the
validity of conditional assignments under New York law.").

Sureties what they would like it to do.

The assignment provision of the Indemnity Agreement is a jaw-breaking, 497 word run-on sentence. An excerpt appears above but it is necessary to quote the entire provision here:

THIRD: ASSIGNMENT - The Principals, the Indemnitors hereby consenting, will assign, transfer and set over, and do hereby assign, transfer, and set over to the Surety, as collateral, to secure the obligations in any and all of paragraphs of this Agreement and any other indebtedness and liabilities of the Principal to the Surety, whether heretofore or hereafter incurred, the assignment in the case of each contract to become effective as of the date of the bond covering such contract, but only in the event of (1) any abandonment, forfeiture or breach of any contracts referred to in the Bonds or of any breach of any said Bonds: or (2) of any breach of the provisions of any of the paragraphs of this Agreement: or (3) of a default in discharging such other indebtedness or liabilities when due: or (4) of any assignment by the Principal for the benefit of creditors, or of the appointment, or of any application for the appointment, of a receiver or trustee for the Principal whether insolvent or not: or (5) of any proceeding which deprives the Principal of the use of any of the machinery, equipment, plant, tools or material referred to in section (b) of this paragraph: or (6) of the Principal's dying, absconding, disappearing, incompetency, being convicted of a felony, or imprisoned if the Principals be an individual: (a) All the rights of the Principals in, and growing in any manner out of, all contracts referred to in the Bonds, or in, or growing in any manner out of the Bonds: (b) All the rights, title and interest of the Principal in and to all machinery, equipment, plant, tools and materials which are now or may hereafter be, about or upon the site or sites of any and all of the contractual work referred to in the Bonds or elsewhere, including materials purchased for or chargeable to any and all contracts referred to in the Bonds, materials which may be in the process of construction, in storage elsewhere, or in transportation to any and all said sites: (c) All the rights, title and interest of the Principal in and to all subcontracts let or to be let in connection with any and all contracts referred to in the Bonds, and in and to all surety bonds supporting such subcontracts: (d) All actions, causes of actions, claims and demands whatsoever which the Principals may have or acquire against any subcontractor, laborer or materialman, or any person furnishing or agreeing to furnish or supply labor, material, supplies, machinery, tools, other equipment in connection with or on account of any and all contracts referred to in the Bonds: and against any surety or sureties of any subcontractors, laborer or materialman; (e) Any and all percentages retained and any and all sums that may be due or hereafter become due on account of any and all contracts referred to in the Bonds and all other contracts whether bonded or not in which the Principal has an interest.

18

Parsing this passage requires a high pain threshold, a law degree and preferably some familiarity with 19th century legal writing. It assigns to the Sureties six baskets of assets described in detail in subsections (a) through (e). It enumerates six events (set forth in subsections (1) through (6)), the occurrence of any one of which triggers the assignment to the Sureties of the listed assets.

Although the Sureties argue that the subcontractor and other third party claims filed under the Project Bonds prior to September 13, 2013, triggered their rights under the assignment provision, no evidence established that those claims resulted from or caused Pihl's failure to perform under the Bonded Project contracts. I find that the event which triggered the Sureties' assignment rights under the Indemnity Agreement was Pihl's ceasing work on the Bonded Projects on September 13, 2013 (see subsection (1) of the assignment provision). At that time the Sureties' assignment rights in the six enumerated baskets of assets sprang into existence and they became entitled to the Second and Third Payments which on September 12, 2013, were sums "due" or to "become due" on the Project Contracts (see subsection (e) of the assignment provision).

So far so good. But the Sureties point to some additional language in the assignment provision preceding the enumerated triggering events and the identification of the assets assigned which they claim extends their assignment right to the First Payment. This introductory phrase states, "the assignment in the case of each contract to become effective as of the date of the bond covering such contract." The payment and performance bonds for the Willimansett Project were issued on April 26, 2011, well before the date of the First Payment.[42] It is the Sureties' contention that by virtue of the introductory language their assignment rights apply to the First

_____

[42] Trial ex. 4 and 5.

19

Payment.

The Sureties appear to interpret the chronological preface of the assignment provision as governing all that follows. A careful review of the provision establishes, however, that the prefatory time-frame is entirely subservient to the subsequent terms. Interpreting the introductory relation-back language as governed by the subsequent terms of the assignment provision rather than as governing those terms results in the understanding that upon the occurrence of a triggering event and the Sureties' acquiring assignment rights in the enumerated assets, their assignment rights would apply to *those assets* retroactive to the date of the bonds. For example, on September 13, 2013, the date of the triggering event, the Sureties acquired assignments of any amounts then held by the Project Owners and due to Pihl, such as for project retainages or unpaid invoices, dating as far back as the issuance of the payment and performance bonds. But if the asset in question, like the First Payment, was not an asset included in any of the six baskets assigned to the Sureties, the introductory relation-back language in the assignment provision would never come into play. Cash is not one of the assets assigned to the Sureties in the Indemnity Agreement and once the First Payment was deposited into Pihl's Middlesex bank account on September 4, 2013, it became fungible cash no longer subject to any rights of the Sureties under the Indemnity Agreement.

The Sureties' lien rights in the First Payment would at best have arisen upon their obtaining the trustee process attachment against Middlesex or perhaps upon the filing of their UCC-1 financing statement. I find, however, that Ms. Dwyer has established that the bank account attachment and the UCC-I filing were preferences under Bankruptcy Code § 547 and therefore the Sureties have no lien claims in the First Payment.

20

<u>Conclusion</u>

The Sureties have both equitable subrogation and contractual assignment rights to the Second and Third Payments. The First Payment is property of the Pihl bankruptcy estate free of any claims of the Sureties. Middlesex shall turn over the First and Second Payments, with any interest actually accrued thereon, to Ms. Dwyer, who is already holding the Third Payment. Ms. Dwyer shall pay the amount of the Second and Third Payments to the Sureties. Judgment will enter on the complaint as follows:

1. Count I in favor of the plaintiff as to the First Payment and in favor of the defendants, ICSP and AIC, as to the Second and Third Payments. The defendant, Middlesex Savings Bank, is ordered to turn over to the plaintiff $250,654.14 (the amount of the First Payment) and $391,428.74 (the amount of the Second Payment). The plaintiff is ordered to pay to ICSP or AIC, as instructed by them in writing, $391,428.74 (the amount of the Second Payment) and $207,088.66 (the amount of the Third Payment);

2. Count II in favor of the plaintiff to the extent the filing of the UCC-1 financing statement perfected a security interest in favor of either or both the defendants, ICSP and AIC, in assets other than the Second and Third Payments;

3. Count III in favor of the defendants, ICSP and AIC, as the preference involved no transfer of physical property and thus there is nothing for the plaintiff to recover;

4. Count IV in favor of the plaintiff to the extent the bank account attachment resulted in a lien in favor of either or both defendants, ICSP and AIC, in assets other than the Second and Third Payments;

5. Count V in favor of the defendants, ICSP and AIC, as the preference involved no

21

transfer of physical property and thus there is nothing for the plaintiff to recover; and

6.  Count VI in favor of the plaintiff as to the First Payment and in favor of the

defendants as to the Second and Third Payments.

At Boston, Massachusetts this 26th day of September, 2016.

By the Court,

_____
Melvin S. Hoffman
U.S. Bankruptcy Judge

Counsel Appearing:     Charles R. Bennett, Esq.
Christopher M. Condon, Esq.
Murphy& King, Professional Corporation
Boston, MA
for Plaintiff, Kathleen Dwyer, Chapter 7 trustee

Bradford R. Carver, Esq.
Eric H. Loeffler, Esq.
Hinshaw & Culbertson LLP
Boston, MA
for Defendants, The Insurance Company of the State of
Pennsylvania and
American International Companies

William M. Zall, Esq.
Cunningham, Machanic, Cetlin, Johnson
Natick, MA
For Defendant Middlesex Savings Bank